**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
-

VISTA FOOD EXCHANGE, INC.,                    :

              Plaintiff,          :     Docket No.
        v.                                              1:17-cv-07454-ALC-SN

                           :

LAWSON FOODS LLC                              :     **SECOND AMENDED**
                              **COMPLAINT**
           Defendants.          :     **WITH JURY DEMAND.**

                           :     Judge Andrew Carter
                           :     Magistrate Judge
                                  Sarah Netburn

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


        Plaintiff Vista Food Exchange, Inc., for its second amended complaint, by

its attorney, Jonathan C. Scott, P.C., respectfully alleges and would show to the Court

as follows:


## NATURE OF ACTION

        1.    This is an action to recover compensatory, consequential and

exemplary damages from Defendant Lawson Foods, LLC ("Lawson"), an out of state

customer that purchased pork products supplied by Smithfield Foods ("Smithfield") from

the Plaintiff wholesaler Vista Food Exchange Inc. ("Vista").  Vista has filed the present

Second Amended Complaint because after submitting the pleading currently on file,

Vista's investigation turned up additional materials relevant to the case, specifically

involving Lawson's creation of falsified documentation enabling the improper pork exports

at the heart of this case.

2.     As detailed more extensively below, Vista brings this suit to address Lawson's intentional and willful disregard of its repeated promises and commitments that Vista, and others, relied upon. Lawson's conduct is alternatively actionable as a breach of multiple contracts, tortious interference, promissory estoppel and fraud.  Although these overlapping multiple contracts share some commonality of subject matter, each contract constitutes a valid, freestanding obligation undertaken and breached by Lawson. The latter tort-based causes of action are appropriate because Lawson has insisted its falsehoods were not within the four corners of any contract between Vista and Lawson, yet such representations were nonetheless made to, and relied on by, Vista.

3.     For decades, Smithfield had been one of Vista's most valuable suppliers.  Vista regularly purchased significant quantities of products from Smithfield for re-sale to Vista's customers, of which Lawson was but one.  However, Vista's long and profitable business relationship with its supplier Smithfield was first disrupted in or about May 2016 – and then suspended beginning in or about May 2017 – as a result of Lawson's intentional misconduct and willful and intentional disregard of Lawson's obligations to Vista.  To date, Vista is still unable to purchase the same quantities of product on the same terms and conditions established during its long-standing relationship with Smithfield.

4.     At all relevant times, Vista was Lawson's primary supplier of Smithfield pork products, with all such purchases being made from and through Vista, utilizing Vista's relationship and line of credit with Smithfield.  Vista then resold such Smithfield products to Lawson.  By way of example, in the 24 months prior to June 2017,

Lawson placed approximately 703 orders for Smithfield products with Vista, with a total approximate value of $17.8 million.

5.     At all times, Lawson knew or should have known that the Smithfield pork it purchased from Vista was intended for domestic use only and had not been certified by Smithfield for export to the Peoples Republic of China ("PRC"), because, among other reasons, the products were not sold to Lawson with export documentation.[1]

6.     Vista alleges and believes that discovery will confirm that Lawson, in deliberate disregard of the law, nonetheless engaged in an intentional, ongoing scheme to export multiple shipments of Smithfield pork products, even though the orders were likewise unaccompanied by the valid documentation necessary to export the product outside of the United States.

7.     Vista alleges and believes that discovery will confirm that in order to evade the export laws of both the United States and the PRC, Lawson routinely created falsified documentation for shipments of such Vista-sold Smithfield pork products.

8.     In or about May 2016, Smithfield Foods first learned of this illegal conduct by Vista's customer Lawson ("First Discovered Violation").  Smithfield promptly notified Vista that it would not tolerate this behavior, and further warned that if Vista-sold Smithfield products were ever again exported to the PRC, it would stop selling its products to both Lawson and Vista alike.

---

[1] As set forth in the Letter Agreement, annexed hereto as Exhibit 2, "[a]ny pork which Smithfield Farmland produces for export to China is properly export certified and documented as ractopamine-free."  Smithfield did not certify the subject product for export to PRC.

9.     Both Vista and Smithfield notified Lawson, orally and in writing, that Vista's relationship with Smithfield was imperiled by Lawson's conduct.

10.     Lawson insisted to Vista that the First Discovered Violation was merely an oversight or an innocent mistake, and promised that such improper exports would not be repeated.  Lawson made these promises to Vista and Smithfield both verbally and in writing.  See Lawson's May 20, 2016 letter addressed to Vista and Smithfield, a true and correct copy of which is annexed hereto as Exhibit 4, and incorporated herein by reference.  See also the May 25, 2016 Letter Agreement signed by Smithfield, Vista and Lawson ("Letter Agreement"), a true and correct copy of which is annexed hereto as Exhibit 2, and incorporated herein by reference.

11.     Based on the nine-year relationship between itself and Lawson, Vista believed Lawson was a reputable customer who would follow the applicable U.S. and PRC export regulations, and who would honor its numerous verbal and written promises to Vista that Lawson would refrain from ever again exporting any Smithfield pork products to the PRC.

12.     During this May 2016 period, Vista was entirely unaware that – despite Lawson's commitments and representations made in the wake of its First Discovered Violation – Lawson intended to continue engaging in its scheme to illegally export Smithfield pork products which were intended for domestic use only.

13.     In continuing such scheme, Lawson was aware that if Smithfield learned of any additional incidents where its products were improperly exported to the PRC, Vista's business relationship with Smithfield would be significantly disrupted and/or

terminated.  Nonetheless, with deliberate indifference to the foreseeable consequences to Vista and its relationship with Smithfield Foods, Lawson continued its export scheme.

14.     On May 31, 2017, Vista received notice from Smithfield that, in November of 2016, Lawson had once again surreptitiously exported Smithfield-supplied pork products to the PRC, in violation of its obligations and representations to Vista ("Second Discovered Violation").

15.     Vista alleges and believes that discovery will confirm that as part and parcel of this illegal export scheme, Lawson mislabeled and mishandled Smithfield products, and prepared and filed forged, falsified and/or incorrect documents with U.S. and PRC Customs officials. The Letter Agreement required that Smithfield pork be properly certified prior to export and did not provide for self-certification by Lawson. Indeed, although the other parties to the Letter Agreement never contemplated or intended that Lawson would be entitled to engage in "self-certification" regarding the exportability of Smithfield's products, Lawson fraudulently proceeded to do just that. Smithfield did not certify its shipments to Vista that were sold to Lawson.  Based upon Vista's review of documents involved in the Second Discovered Violation, Lawson improperly generated its own export documentation in the manner set forth below.

16.     Vista alleges and believes that discovery will confirm that Lawson falsified the "Meat And Poultry Export Certificates Of Wholesomeness" accompanying the Second Discovered Violation product.  True and correct copies of certain such Export Certificates Of Wholesomeness are annexed hereto as Exhibit 5, and incorporated herein by reference.  Specifically, Lawson's Export Certificates Of Wholesomeness, dated November 17, 2016, falsely indicated that the animals had been inspected pursuant to a

USDA Food Safety and Inspection Service ("FSIS") program requiring inspection by an accredited veterinarian both before and after the slaughtering process.   The FSIS Certificate expressly requires that the inspector certify "that the meat or meat food product specified hereon is from animals that received both antemortem and postmortem inspection and were found sound and healthy and that is has been inspected and passed as provided by law and regulations of the Department and is sound and wholesome." (See Exh. 5.)   The pre- and post-slaughter inspections sworn to on the 11/17/16 Export Certificates Of Wholesomeness could not have been so performed, given that the Second Discovered Violation product arrived at Lawson's New Jersey facility already processed, boxed and frozen, from animals which had been slaughtered a week earlier at Smithfield facilities in North Carolina. True and correct copies of the shipping records relevant to the Second Discovered Violation product are annexed hereto as Exhibit 6. Moreover, Smithfield at no time authorized Lawson to execute non-contemporaneous Export Certificates Of Wholesomeness premised upon processing already performed in Smithfield facilities.

17.     Vista alleges and believes that discovery will reveal that the signature purporting to be that of a USDA accredited Doctor of Veterinary Medicine ("DVM") on the "Meat And Poultry Export Certificates Of Wholesomeness" is either a forgery and/or was not of an authorized person and/or that the DVM did not follow requisite procedures.

18.     Vista alleges and believes that discovery will confirm that Lawson's New Jersey facility was not qualified to participate in the USDA Never Fed Beta Agonists Program.

19.     Vista alleges and believes that discovery will confirm that Lawson was not the producer or processing plant for the subject product.

20.     Vista alleges and believes that discovery will confirm that Lawson also doctored the shipping labels accompanying the Second Discovered Violation, to make it appear that such product was being shipped directly from Smithfield in North Carolina, thereby trading on Smithfield's status as both a PRC-affiliated entity, and a reputable exporter of pork.  True and correct copies of the shipping labels and stickers affixed to the Second Discovered Violation product packaging are annexed hereto as Exhibit 7.

21.     Vista alleges and believes that discovery will confirm that Lawson likewise pasted stickers on the Second Discovered Violation product which falsely claimed that such product was USDA-inspected and approved for export.  See Exh. 7.  In sum, as originally transferred by Smithfield to Vista and subsequently to Lawson, the Second Discovered Violation product lacked all required export documentation, yet arrived in the PRC accompanied by bogus paperwork authorizing such export based upon supposed FSIS-authorized "inspections" that Lawson could not and did not perform.

22.     Upon learning of Lawson's Second Discovered Violation, supplier Smithfield refused to do any business with Vista as a foreseeable and direct consequence of Lawson's ongoing pattern of illegal exports of Vista-sold Smithfield product to the PRC.  Lawson knew or should have known that its conduct would lead to the interruption/cessation of Vista's business relationship with Smithfield, but nonetheless acted in direct disregard of Vista's rights and interests.

23.     As a consequence of Lawson's misconduct, in or about June of 2017, Smithfield wholly cut off Vista's ability to acquire and resell Smithfield products.  Because Lawson was only one of several Vista customers who regularly purchased Smithfield products from Vista, Vista lost substantial business from all such customers as a consequence of this Lawson-caused termination of Vista's access to Smithfield products.

24.     After substantial efforts by Vista, Smithfield eventually resumed some shipments to Vista in mid-March of 2018, but on terms less favorable than those in place prior to the Lawson-caused termination.

25.     Vista has suffered substantial damages as a consequence of Lawson's unlawful conduct, including direct damages, consequential damages, compensatory damages, loss of goodwill, damage to its reputation and lost profits, most significantly from the cessation/interruption of Vista's business relationship with Smithfield.

**PARTIES**

26.     Plaintiff Vista is a domestic corporation duly organized and existing under the laws of the State of New York and in good standing since 1979, with its principal place of business in the Hunts Point Coop Market, Bronx, New York.  Vista is in the business of wholesale sourcing, purchasing, and sale of food products, including both perishable and shelf-stable.

27.     Defendant Lawson Foods LLC is, upon information and belief, a limited liability company duly organized and existing under the laws of the State of New

Jersey. Its principal place of business is Irvington, New Jersey.  It was established in or about 2005.

28.    Upon information and belief, Simon Law is the sole member and president of Lawson Foods.  Upon information and belief, he is a U.S. citizen and resides in Irvington, New Jersey.

## JURISDICTION AND VENUE

29.    Subject-matter jurisdiction exists pursuant to 28 U.S.C. § 1332 because Vista is a citizen of a different state than Lawson, and because the value of the matter in controversy exceeds $75,000, exclusive of interest and costs.

30.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) & (b)(3) because (i) a substantial part of the events or omissions giving rise to the claim occurred in this District, and (ii) Defendant Lawson is subject to the jurisdiction of this Court.

31.    Venue is also proper in this District because Defendant Lawson has consented to venue in the City and County of New York.

32.    This Court has personal jurisdiction over Lawson on the basis of consent, as Defendant purchased goods pursuant to invoices consenting to jurisdiction in New York, and likewise executed a contract consenting to jurisdiction in New York, New York.

33.    The Court also has personal jurisdiction over Lawson pursuant to CPLR § 302(a)(1) because the suit arises from the transaction of business in New York, including without limitation Lawson's purchase of substantial quantities of wholesale food

products from Vista in New York.  This Court also has personal jurisdiction pursuant to CPLR § 302(a)(3), because the suit arises out of Lawson's commission of tortious acts in New York, and because Defendant regularly does or solicits business in, and/or has otherwise engaged in other persistent courses of conduct in New York.

## FACTS RELEVANT TO ALL CAUSES OF ACTION

34.    For decades, Smithfield and Vista have had a long-standing and profitable business relationship, whereby Vista purchased Smithfield products for sale and distribution to third parties, like Lawson Foods.

35.    As relevant to this action, Vista purchases food products at wholesale directly from suppliers, such as Smithfield, and sells them to third party customers, such as Lawson Foods, who first became a Vista customer in 2007.  Lawson was only one of many customers that Vista sold Smithfield products to, and such transactions with Lawson constitute only a fraction of Vista's total profits from the purchase and sale of Smithfield products.

36.    Vista sells its food products only to customers who have an account with Vista.  Accordingly, it was necessary for Lawson to apply for and have a customer account with Vista before it could place any orders.

37.    On or about February 6, 2007, Lawson first submitted an application to establish an account with Vista to purchase wholesale food products, including pork products.  Lawson submitted the application for credit (the "Credit Application") to Vista's office in New York.  The Credit Application was signed by Simon Law as Managing Member of Lawson Foods.  In connection with the Credit Application, Simon Law also

executed a Continuing Guaranty to induce Vista to enter into the relationship with Lawson. The Credit Application and Continuing Guaranty are collectively referred to as the "Credit Agreement", and true and correct copies of both such documents comprising the Credit Agreement are annexed hereto as Exhibit 1 and incorporated herein by reference.

38.     The Credit Agreement included Lawson's promise to pay for all costs, expenses and fees incurred for litigation of all kinds arising from its transactions with Vista, and included the following forum-selection and choice-of-law provision:

> Litigation of all kinds arising from transactions subject of this guaranty shall be subject to venue in the State and County of New York. New York law shall apply.  *Id.*

39.     On or about February 15, 2007, Vista approved Lawson Foods's credit application and established an account and a line of credit at Vista in Lawson's name.  Having an account allowed Lawson to purchase wholesale food products from Vista on credit.

40.     For the next nine years, Lawson was a trusted customer of Vista. The parties were in regular communication, and Vista relied on Lawson's statements.

41.     Vista sold Smithfield products to Lawson for domestic use only.

42.     All product in question was ordered from Smithfield by Vista and distributed by Vista to Lawson in Irvington, New Jersey.

43.     After such Smithfield-supplied products were sold to Lawson, Vista had no further involvement therewith.

44.     As relevant here, Lawson regularly purchased pork and other protein products from Vista, including products produced by Smithfield.

45.     During the relevant time, Vista was Lawson's primary supplier of Smithfield pork products, with all such purchases being made from and through Vista, utilizing Vista's relationship and line of credit with Smithfield.  All such products were first purchased by Vista from Smithfield, and then resold to Lawson.  By way of example, in the 24 months prior to June 2017, Lawson placed approximately 703 orders for Smithfield products with Vista, with a total approximate value of $17.8 million.

46.     Vista alleges and believes that discovery will confirm that because of Vista's longstanding credit and distribution relationship with Smithfield, Lawson was able to buy Smithfield products from Vista on more favorable terms than were otherwise available to Lawson.

47.     The laws and regulations of the United States (and, upon information and belief, the PRC), as well as industry custom and practice, require that products-for-export be accompanied by appropriate documentation, so as to permit customs inspectors and all other regulatory bodies to ensure that all applicable guidelines and regulations are met.  In other words, food products may not be exported to another country without proper export documentation.  Thus, food products which are sold without such export documentation are necessarily not intended for export.

48.     The non-certified pork products which were supplied by Smithfield to Vista, and then distributed by Vista to Lawson, were fit for human consumption under U.S. law and regulations, but were not certified for export to the PRC by the processor, Smithfield.  Such products likewise lacked all documentation necessary for export to the PRC, because they were not intended for export by either Smithfield or Vista.

49.     At all times, Vista and Lawson understood and agreed that all Smithfield pork product sold by Vista to Lawson was for domestic (U.S.) resale only, as the product was not sold with export documentation and could not legally be exported.

50.     Had the Smithfield-supplied product that Vista sold to Lawson been eligible for export, Smithfield would have provided Vista with accompanying documentation to that effect.

51.     Lawson never requested export documentation from either Vista or Smithfield, and none was ever provided.  Similarly, Lawson never informed Vista or Smithfield that it intended to export such Vista-sold Smithfield products to the PRC.

52.     None of the Smithfield products sold by Vista to Lawson were accompanied by export documentation, because the products were never intended for export.

53.     In a letter dated July 15, 2017, Lawson once again acknowledged that it understood that, under Vista's terms of sale, all Vista-sold Smithfield products were intended for U.S. domestic use only.  A true and correct copy of Lawson's July 15, 2017 letter is annexed hereto as Exhibit 3, and incorporated herein by reference.

54.     At all times, Vista reasonably believed that Lawson would – in compliance with i) its obligations to Vista, ii) applicable law and regulations, and iii) industry custom and practice – refrain from exporting the Smithfield pork products sold to it without export documentation.

55.     As acknowledged by Lawson in executing the Letter Agreement, processors (such as Smithfield) whose products are exported without proper documentation are subject to penalties under the laws of the PRC.  See Exh. 2.

13

56.     Smithfield has substantial operations in the PRC.  Thus, full and strict compliance with PRC export requirements, even as to Smithfield product processed in the United States, is very important.  Lawson was fully aware of these circumstances, and the probable consequences for non-compliance.

57.     Nevertheless, in or about May 2016, Lawson, acting alone or in concert with others, engaged in the First Discovered Violation, which involved exporting to the PRC pork products which had been purchased from Vista, and supplied by Smithfield for U.S. consumption.  Lawson's actions were in violation of export regulations, industry custom and practice, and its obligations to Vista.

58.     Vista alleges and believes that discovery will confirm that in carrying out such scheme, Lawson, acting alone or in concert with others, submitted bogus export documentation to U.S. and PRC custom officials.  Smithfield provided no such export documentation to Vista for the product resold by it to Lawson.

59.     Upon learning from Smithfield of Lawson's First Discovered Violation, Vista immediately put all Lawson orders on hold, and warned Lawson that Vista would cancel all of Lawson's pending and future orders if Lawson did not agree to cease exporting Vista-sold Smithfield pork products to the PRC.

60.     Although Vista initially believed the First Discovered Violation to be an isolated incident, Vista alleges and believes that discovery will confirm that it in fact represented on only one small portion of Lawson's ongoing scheme of improper exportation.

61.     After learning of the First Discovered Violation, Smithfield likewise took immediate action, informing both parties that Vista's relationship with Smithfield was

imperiled by Lawson's conduct.  Smithfield told the parties that it would cancel all current (and likely all future) Vista and Lawson orders for Smithfield pork products, unless they took immediate action to ensure that Vista-sold Smithfield products were not exported to the PRC.

62.     On or about May 20, 2016, Simon Law, President of Lawson Foods, spoke with Vista representatives Michelle Whaley and Dickie Lank, and promised that Lawson would never again export Vista-sold Smithfield products to the PRC.  Law informed Vista that the First Discovered Violation was merely an oversight or an innocent mistake, and promised that it would not to be repeated.   Later events, however, strongly suggest that these statements by Lawson were knowingly false, including Law's open admission, at ¶8 of his March 28, 2018 Declaration, that – in November, 2016 – Lawson intentionally shipped Vista-sold Smithfield product to the PRC.  A true and correct copy of Law's Declaration is annexed hereto as Exhibit 8, and incorporated herein by reference.

63.     Also, on or about May 20, 2016, Lawson sent a letter addressed to Vista and Smithfield, promising both parties that "*Lawson Foods will agree to the terms put forth of not shipping Smithfield pork to PRC China…*"  See Exh. 4.

64.     At the time Lawson made these promises to Vista, Lawson had at least twelve orders pending with Vista for Smithfield pork products. In agreeing to never again export Smithfield pork products to the PRC, Lawson explicitly acknowledged that a failure to honor this promise would result in Vista's cancellation of all such pending orders. See Exh. 4.

15

65.     Both  Vista and Lawson intended that Lawson's disavowal of PRC exportation likewise extended to any and all future orders of Smithfield pork products to be placed with Vista.

66.     Shortly thereafter, Smithfield and Vista negotiated the language and terms of the May 25, 2016 Letter Agreement, which they intended to govern all of Lawson's future purchases from Vista of Smithfield pork products.  Once finalized, such Letter Agreement was then circulated for review and signature by Lawson.  See Exh. 2. Under the terms of the Letter Agreement:

a.     Lawson again agreed that it would not export any non-certified Smithfield pork products directly or through any third party where there is any reason to believe that such product is destined for export to the PRC.

b.     Vista agreed that it would not knowingly sell Smithfield pork products to Lawson that it believes Lawson intends to export to the PRC.

c.     Smithfield acknowledged its valued relationship with Vista, and stated that it did not believe that Vista knowingly sold product to a customer who intended to export such to the PRC.

67.     The May 25, 2016 Letter Agreement does not have a merger clause, does not reference the oral and written May 20, 2016 promises separately made by Lawson to Vista, nor does it provide that Lawson's May 20, 2016 promises were in any way superseded or rescinded by the execution of the Letter Agreement.  In sum, Lawson's contractual obligations under these two distinct agreements are independent of each other, despite some commonality of subject matter.

68.     In the May 25, 2016 Letter Agreement, Smithfield warned Vista and Lawson that it would undertake efforts to monitor future exports and stated: "*If we find any evidence of shipment of these products to the PRC by Lawson, in strict violation of PRC regulations, we will cancel all orders from Vista intended for Lawson, and take any other actions we deem appropriate and the violator will be responsible for any and all losses arising from export of non-certified pork to the PRC.*"  See Exh. 2.  Consequential and incidental damages were not excluded, and the words "any and all" mean that the violator would be responsible for any and all losses.  Although the Letter Agreement itself did not explicitly define what "other actions" Smithfield might take upon discovering any further export violations, Vista had previously informed Lawson that such violations would jeopardize Vista's future relationship with Smithfield, and subsequently reiterated these warnings in the parties' July 2016 meetings.

69.     Smithfield, Vista, and Lawson each signed the Letter Agreement acknowledging their understanding and acceptance of its terms and conditions.  See Exh. 2.

70.     Lawson's President Simon Law was the first signatory to execute the Letter Agreement, after which Lawson then forwarded the Agreement to be executed by Vista, thereby acknowledging the three-way nature of the obligations created thereunder.

71.     At all times, Lawson understood that under the terms of the Letter Agreement, it was promising both Vista and Smithfield that it would not ship Smithfield pork products to the PRC.

72.     Vista alleges and believes that discovery will confirm that Lawson signed the Letter Agreement after consulting with counsel.  Neither counsel nor Lawson

made any changes to the version of the Letter Agreement drafted by Smithfield and Vista, so as to indicate that Lawson's obligations created thereunder flowed only to Smithfield, and not to Vista as well. Similarly, the promises made by Lawson in the Letter Agreement contain no language indicating they are being made only to Smithfield, and not also to Vista.

73. On or about July 18, 2016, Simon Law, President of Lawson Foods, personally met with representatives of Vista in two separate meetings. One meeting was held with Michelle Whale and Dickie Lank at Lawson's facility in New Jersey, and a second meeting was held at Vista's office in Bronx, New York with Vista President Vincent Pacifico.

74. At each meeting, Law reiterated Lawson's promise to Vista that it would not export Smithfield pork products to the PRC. Law told Vista's representatives that he understood that Vista would continue to do business with Lawson only if it honored its promise not to export Vista-sold Smithfield products to the PRC.

75. Law and Lawson knew that any further incident where it exported Vista-sold Smithfield pork products to the PRC would cause catastrophic damage to the relationship between Vista and Smithfield, and would likely result in the significant interruption and/or cessation of the business relationship between the two.

76. In reliance on Lawson's numerous written and oral representations, made during May through July of 2016, Vista continued to sell Smithfield pork products to Lawson.

77.     If Vista had known that Lawson did not intend to honor its promises, it would have ceased doing business with Lawson after the First Discovered Violation, and would not have accepted or filled any other orders from Lawson.

78.     On May 31, 2017, Vista received notice from Smithfield regarding Lawson's Second Discovered Violation, whereunder items from at least three Vista purchase orders (P.O. # 1457555, 1457556, 1457558) had been found in PRC. All such items had been sold by Vista to Lawson in November of 2016.  At the time, Smithfield indicated that there were a number of other items from Vista purchase orders under "suspicion" as well.

79.     It is now apparent that despite its promises, Lawson Foods had again violated its obligations and illegally exported Vista-sold Smithfield pork products (this time, frozen pork spare ribs) to the PRC.

80.     Immediately after the Second Discovered Violation, Smithfield refused to sell any product to Vista, as a foreseeable, direct and proximate consequence of Lawson's unlawful export of non-certified Smithfield pork products to the PRC.  Vista thereafter suffered a significant, costly disruption to its business as a result, as Smithfield terminated all shipments to Vista, for a period of nine months.

81.     Although Vista eventually succeeded in persuading Smithfield to resume shipments in March of 2018, Vista has been unable – as a continuing result of Lawson's wrongdoing – to fully resume business with Smithfield, nor to acquire Smithfield products from the processor on the terms and conditions it had previously established over many years of doing business.  This has resulted in a substantial loss of business to Vista.

82.     Vista has and continues to suffer substantial damages as a result of Lawson's actions, including lost profits, which continue to accrue.

## FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT—TERMS OF SALE/EXPORT CONDITIONS)

83.     Vista repeats and re-alleges each and every allegation contained above as if fully set forth herein.

84.     The laws and regulations of the United States, and upon information and belief those of the PRC, as well as industry custom and practice, provide that food products may not be exported to another country without valid export documentation. Compliance with applicable state and federal laws is deemed an implied term of all contracts, and parties can likewise validly contract to comply with foreign law. *In Re Currency Conversion Fee Antitrust Litigation*, 264 FRD 100, 118 (SDNY 2010). As such, food products which are sold without accompanying export documentation are not intended for export.

85.     At all relevant times, the parties understood and agreed that the uncertified Smithfield pork products sold by Vista to Lawson were for domestic (U.S.) resale only, as the products were sold without export documentation, and could not legally be exported.

86.     In its letter dated May 20, 2016, Lawson reiterated its commitment to honor these terms of sale/export conditions, by agreeing to refrain from "*shipping Smithfield Farmland pork to PRC China*". See Exh. 4.

87.     Similarly, Lawson's ongoing agreement to these terms of sale/export conditions, throughout its relationship with Vista, is explicitly confirmed by Lawson's June

15, 2017 letter signed by its Managing Member and President, Simon Law, which states that "*Under Vista's terms of sale, all product was sold to Lawson for U.S. domestic use*". See Exh. 3.

88.     In purchasing Smithfield pork products from Vista that were not certified for export, Lawson agreed to adhere to these terms of sale/export conditions—specifically, that it would not export Vista-sold Smithfield pork products to the PRC.

89.     Defendant Lawson breached its contract with Vista regarding such terms of sale/export conditions, by directly or indirectly exporting products purchased from Vista to the PRC.

90.     Vista fully performed all or substantially all of its obligations under the contract concerning such terms of sale/export conditions, specifically in that it continued to distribute Smithfield products to Lawson, or was otherwise excused from such performance.

91.     As a result of Lawson's breaches, Vista has suffered damages in an amount to be determined at trial, including without limitation significant interruption of its business dealings with Smithfield, lost profits, lost opportunities, loss of goodwill and loss of reputation.

92.     Vista therefore demands damages according to proof, plus interest, costs, and attorney's fees to the extent allowed by law.

**SECOND CAUSE OF ACTION**
(BREACH OF CONTRACT— LETTER AGREEMENT)

93.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

94.     In addition to the above-described contract regarding terms of sale/export conditions, on or about May 25, 2016, Vista, Lawson, and Smithfield also entered into the written three-party Letter Agreement pursuant to which Lawson once again agreed, *inter alia*, not to export to the PRC, either directly or indirectly through any third party, any Smithfield pork products sold to Vista with delivery to Lawson with no export documentation. See Exh. 2.

95.     The Letter Agreement required Smithfield product to be properly export certified and did not provide for self-certification by Lawson.  Smithfield did not certify its shipments to Vista that were subsequently sold by Vista to Lawson.

96.     Vista fully performed all or substantially all of its obligations under the Letter Agreement – namely, continuing to distribute Smithfield products to Lawson – or was otherwise excused from such performance.

97.     Lawson breached the Letter Agreement by directly or indirectly exporting non-certified Smithfield pork products to the PRC.

98.     As a result of Lawson's breaches, Vista has suffered damages in an amount to be determined at trial, including without limitation significant interruption of its business dealings with Smithfield, lost profits, lost opportunities, loss of goodwill and loss of reputation.

99.     Vista therefore demands damages according to proof, plus interest, costs, and attorney's fees to the extent allowed by law.

**THIRD CAUSE OF ACTION**
(ALTERNATIVE, BREACH OF CONTRACT—LETTER AGREEMENT
[VISTA AS THIRD PARTY BENEFICIARY])

100.    Vista repeats and re-alleges each and every allegation contained above as if fully set forth herein.

101.    On or about May 25, 2016, Vista, Lawson, and Smithfield signed the written Letter Agreement pursuant to which Lawson agreed, *inter alia*, not to export any non-certified Smithfield pork products to the PRC, either directly or indirectly through any third party.  See Exh. 2.

102.    Pleading in the alternative, to the extent the Court determines that Vista was not an actual party to the Letter Agreement, Vista was nonetheless a third party beneficiary of the Agreement.  *See, Bd. of Educ. of Northport-E. Northport Union Free School Dist. v Long Is. Power Auth.*, 130 AD3d 953, 954–55 (2d Dept 2015) (affirming order denying motion to dismiss breach of contract claim by non-party as to contractual promise to co-party that benefitted plaintiff).

103.    There existed a valid and binding contract between Lawson and Smithfield in the Letter Agreement.  Specifically, Lawson agreed not to export any non-certified Smithfield pork products directly or through any third party where there was any reason to believe that such product was destined for export to the PRC.  In return, Smithfield agreed not to cancel Vista's orders for Smithfield product intended for distribution to Lawson.

104.    Lawson's express contractual promise in the Letter Agreement – i.e. to cease or refrain from illegal exportation of non-certified Smithfield product purchased from Vista – directly benefitted Vista by i) avoiding a claim by Smithfield against its

customer Vista for losses arising from such export violations; ii) preserving Vista's longstanding and profitable business relationship with Smithfield; and iii) protecting Vista's ability to continue to sell Smithfield pork products to Lawson and to its other customers.  Vista was also directly benefitted because Smithfield subsequently filled the twelve orders Vista then had pending for re-sale to Lawson.

105.   The benefit to Vista under the Letter Agreement is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties (Lawson and Smithfield) of a duty to compensate Vista if Lawson violated the Letter Agreement by exporting Smithfield pork products to the PRC.

106.   There is no language in the Letter Agreement negating reliance by Vista upon Lawson's promises, or waiving or excluding the rights of third party beneficiaries such as Vista.

107.   As a result of Lawson's breaches of the Letter Agreement, third party beneficiary Vista has suffered damages in an amount to be determined at trial, including without limitation significant interruption of its business dealings with Smithfield, lost profits, lost opportunities, loss of goodwill and loss of reputation.

108.   Vista therefore demands damages according to proof, plus interest, costs, and attorney's fees to the extent allowed by law.

**FOURTH CAUSE OF ACTION**
(BREACH OF CONTRACT—JULY 2016 ORAL AGREEMENT)

109.   Vista repeats and re-alleges each and every allegation contained above as if fully set forth herein.

110.    As detailed above, on or about July 18, 2016, Lawson's President Simon Law personally met with representatives of Vista in two separate meetings.

111.    At each meeting, Law unequivocally promised to Vista that Lawson would not export Smithfield pork products to the PRC.

112.    Based upon Lawson's promises, Vista continued to do business with Lawson and allowed Lawson to continue to purchase Smithfield products, despite Smithfield's prior threats to punitively restrict its business relationship with Vista, by reason of Lawson's actions in the First Discovered Violation.

113.    Vista fully performed all or substantially all of its obligations under the July 2016 oral agreement, or was otherwise excused from such performance.

114.    Lawson breached the oral agreement by directly or indirectly exporting Vista-sold Smithfield pork products to the PRC.

115.    As a result of Lawson's breaches of the oral agreement, Vista has suffered damages in an amount to be determined at trial, including without limitation significant interruption of its business dealings with Smithfield, lost profits, lost opportunities, loss of goodwill and loss of reputation.

116.    Vista therefore demands damages according to proof, plus interest, costs, and attorney's fees to the extent allowed by law.

## FIFTH CAUSE OF ACTION
### (TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP)

117.    Vista repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

118.    Vista had a valid business relationship or expectancy with Smithfield. Under this established ongoing business relationship, Vista purchased certain meat products from Smithfield in exchange for payment, and then Vista subsequently distributed/sold such products to its third-party customers.

119.    Lawson had knowledge of this business relationship or expectancy. Moreover, Vista had repeatedly warned Lawson that its improper exports of Vista-sold, Smithfield-supplied products was jeopardizing Vista's future relationship with Smithfield.

120.    As set forth above, Lawson unlawfully and repeatedly exported non-certified Smithfield pork products purchased from Vista to the PRC.

121.    Vista alleges and believes that discovery will confirm that Lawson's conduct included – but was not limited to – wrongful means such as falsifying product documentation, and submitting such to U.S. and PRC customs officials in order to mislead them.

122.    Lawson's unlawful export of Vista-purchased, Smithfield-supplied pork products to the PRC was also contrary to Lawson's repeated assurances of regulatory compliance, and Vista's and Smithfield's explicit, repeated demands that such products not be exported.

123.    In improperly exporting pork products, Lawson acted with intent to destroy Vista's relationship with Smithfield, as well as Vista's reputation, goodwill, and business opportunities.

124.    Vista has suffered damages as a result of Lawson's conduct.

125.   Defendant Lawson's conduct was illegal, wanton, malicious and intended to interfere with Vista's business relationship with its processor, Smithfield, and it has succeeded in doing so.

126.   As a result of the misconduct complained of, the business relationship between Smithfield and Vista was initially terminated for over nine months, and has not yet been fully restored.  During such nine-month termination, Vista was wholly unable to order Smithfield products for any of its customers, and even now remains unable to acquire Smithfield products on the terms and conditions it had previously established over many years of doing business.  This has resulted in a substantial loss of business to Vista.

127.   Accordingly, Lawson is liable for damages arising by reason of its tortious interference, in an amount to be determined at trial.

128.   Defendant Lawson has committed the acts alleged above willfully, deliberately, recklessly, intentionally, and in conscious disregard of Vista's rights.  Vista is therefore entitled to exemplary and punitive damages in an amount sufficient to punish, deter and make an example of Lawson.

## SIXTH CAUSE OF ACTION
### (IN THE ALTERNATIVE, PROMISSORY ESTOPPEL)

129.   Vista repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

130.   Lawson, through its President Simon Law, made the following clear and unambiguous promises to Vista:

a. In a letter addressed to Vista dated June 15, 2017, Lawson promised that the Smithfield-supplied products it purchased from Vista were only for domestic consumption or use, as confirmed by Exhibit 3;

b. In a letter dated May 20, 2016, addressed to Vista and Smithfield, Lawson promised both parties that "*Lawson Foods will agree to the terms put forth of not shipping Smithfield pork to PRC China…*", as confirmed by Exhibit 4;

c. In the Letter Agreement dated May 25, 2016, Lawson again promised Vista and Smithfield, *inter alia*, that Lawson Foods would not export any "*non-certified Smithfield pork products directly or through any third party where there is any reason to believe that such product is destined for export to the PRC*", as confirmed by Exhibit 2;

d. On July 18, 2016, Lawson's President Simon Law personally met with Vista's representatives Michelle Whaley and Dickie Lank (as well as Julie Banister of Smithfield), at Lawson's facility in New Jersey, and later met the same day with Vista's President Vincent Pacifico at Vista's Office in Bronx, New York.  In each meeting, Law promised Vista that Lawson would not export Smithfield pork products to the PRC.

131.   Vista reasonably relied on all of the above-specified promises.

132.   At the time Lawson made each of these promises, it was foreseeable that Vista would rely on these promises.

133.   Vista relied on these promises to its detriment and suffered injury as a result of the reliance.

134.   As a consequence of Lawson's breach of these promises, Vista has been damaged in an amount to be established according to proof at trial.

**SEVENTH CAUSE OF ACTION**
(IN THE ALTERNATIVE, FRAUD)

135.   Vista repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

136.   Since the 2007 inception of the business relationship between Lawson and Vista, Lawson has repeatedly represented to Vista that i) it would honor its regulatory obligations under both U.S. and PRC law with regard to food products purchased from Vista, and ii) that it would honor Vista's terms of sale/export conditions, which provided that all product was sold to Lawson for U.S. domestic use only.  See Exh. 3.

137.   In or about May 2016, Vista and Smithfield learned of Lawson's First Discovered Violation, in which Lawson had exported uncertified Smithfield pork products to the PRC in violation of both applicable export laws, and Lawson's promises to observe Vista's terms of sale/export conditions.

138.   Upon learning of the First Discovered Violation, Vista informed Lawson that it would cancel all existing Lawson orders if Lawson did not immediately agree to cease shipping Vista-sold Smithfield products to the PRC.

139.   On or about May 20, 2016, Simon Law, President of Lawson Foods, spoke with Vista representatives Michelle Whaley and Dickie Lank, and promised that Lawson would not export Vista-sold Smithfield product to the PRC.  Law informed Vista that Lawson's First Discovered Violation was merely an oversight or an innocent mistake, and promised that it would not to be repeated.

140.   On or about May 20, 2016, Lawson sent a letter signed by President Simon Law addressed to Vista and Smithfield, which promised both parties that "*Lawson Foods will agree to the terms put forth of not shipping Smithfield pork to PRC China…*" See Exh. 4.

141.   At the time, Lawson Foods had at least twelve orders pending with Vista for Smithfield pork products.

142.   In its May 20, 2016 letter, Lawson explicitly acknowledged that it was aware that unless Lawson agreed to the condition that it would not ship Smithfield pork to the PRC, Vista would cancel all of Lawson's pending orders.

143.   In the May 25, 2016 Letter Agreement, Lawson (via its President Law) represented to both Smithfield and Vista that, *inter alia*, Lawson Foods would not export any non-certified Smithfield pork products directly or through any third party, where there was any reason to believe that such product was destined for export to the PRC.  See Exh. 2.

144.   On or about July 18, 2016, Lawson's President Simon Law personally met with Vista's representatives Pacifico, Whaley and Lank, in two separate meetings, as more fully set forth above.  During each meeting, Law promised Vista that Lawson would no longer export Smithfield pork products to the PRC.

145.   Vista alleges and believes that discovery will confirm that Lawson's illegal exportation to the PRC was not limited to the two Discovered Violations, but was instead part of a larger ongoing scheme.  Vista further alleges and believes that discovery will confirm that, in furtherance of such scheme, Lawson and/or others acting on its behalf routinely created falsified origin and product export documentation to deceive both U.S. and PRC regulators, and routinely mislabeled and mishandled Smithfield branded food.

146.   The Letter Agreement required Smithfield pork to be certified with appropriate export documentation, and did not provide for self-certification by Lawson, prior to export.  As sold by Smithfield to Vista to Lawson, all relevant pork products lacked such export documentation, forbidding their export anywhere.  Nonetheless, in connection with the Second Discovered Violation, Lawson improperly sought to circumvent this obstacle by generating its own phony documentation, which included i) falsified Export Certificates Of Wholesomeness, premised upon contemporaneous veterinary inspections of the animals which Lawson could not and did not perform (Exh. 5); ii) shipping labels falsely indicating that the product was being shipped directly from Smithfield (see Exh. 7); and iii) stickers falsely claiming that the product was USDA-inspected and approved for export (see Exh. 7).   Although these phony documents were created <u>after</u> the misrepresentations being sued upon, Lawson's subsequent acts of wrongdoing are relevant to establish its state of mind at the time such representations were made.  *Baena v. Woori Bank*, 515 F. Supp.2d 414, 421-22 (SDNY 2007).

147.   As Vista later discovered, the material representations made by Lawson's President Law, specifically that Lawson would halt all exports of Vista-sold Smithfield products to the PRC, were intentionally false when made to Vista.  See, for

example, Law's open admission, at ¶8 of his March 28, 2018 Declaration, that – in

November, 2016 – Lawson intentionally shipped Vista-sold Smithfield product to the

PRC.  See Exh. 8.

148.    Lawson made the misrepresentations to Vista with the intent to

induce Vista to rely on said misrepresentations.

149.    Vista justifiably relied on Lawson's representations, as it continued

to sell Smithfield pork products to Lawson.

150.    Vista suffered substantial injury as a result of its reliance on

Lawson's misrepresentations.

151.    Accordingly, Lawson is liable for fraud in an amount to be determined

at trial.

152.    Defendant Lawson Foods has committed the above alleged acts

willfully, deliberately, recklessly, intentionally, and in conscious disregard of Vista's rights.

Vista is therefore entitled to exemplary and punitive damages in an amount sufficient to

punish, deter and make an example of Lawson.

**JURY DEMAND**

153.    Vista respectfully demands a trial by jury as to all issues so triable.

WHEREFORE,  Plaintiff V i s t a   F o o d   E x c h a n g e ,   I n c .   demands

judgment against Defendant Lawson Foods, LLC as follows:

(A)    For  a  judgment  against  Lawson  for  compensatory  and

consequential damages of ten million dollars ($10,000,000), and

exemplary damages of twenty million dollars ($20,000,000) along with pre- and post-judgment statutory interest;

(B)    For Vista's attorneys' fees and costs and disbursements;

(C)    For such other and further relief to Vista as the Court deems just and proper.

Dated: April 19, 2018

/s/    *Jonathan C. Scott*
JONATHAN C. SCOTT (JS0813)

JONATHAN C. SCOTT, P.C.
1920 McKinney Avenue, 7th Floor
Dallas, Texas 75201
(214) 999-2901

Attorneys for Vista Food Exchange, Inc.

## CERTIFICATE OF SERVICE

The attached (including all exhibits) was served upon all parties and their counsel of record via the Court's electronic filing system on April 19, 2018.

/s/    *Jonathan C. Scott*

JONATHAN C. SCOTT