LAW OFFICES
# JONATHAN C. SCOTT, P.C.
BUSINESS LAW, and LITIGATION

**1920 McKinney Ave.**
**7th Floor**
**Dallas, Texas 75201**

DIRECT DIAL: (214) 999-2901
DIRECT FAX: (972) 773-9967
attorneyjcscott@gmail.com

July 30, 2019

**VIA ECF and Electronic Mail Only**

Hon. Sarah Netburn
United States District Court for
the Southern District of New York
40 Foley Square, Room 219
New York, NY 10007
Netburn_NYSDChambers@nysd.uscourts.gov

Re: Vista Food Exchange Inc. v. Lawson Foods, LLC, No. 1:17-cv-07454-ALC-SN
Plaintiff's Post-Hearing Letter Brief Concerning Contempt and Sanctions.

Dear Judge Netburn:

Fortress Foods, LLC and Hong Lin defaulted and should be held in contempt with substantial daily fines from the October 15, 2018 due date on the subpoena (Hearing Ex. (HE 1)) to the date of the Court's order. With respect to Simon Law and Lawson, it is requested that upon the order holding Law and Lawson in contempt, that the Court impose terminating sanctions, a default judgment and an order that both Law and Lawson are jointly and severally liable for all of Vista's litigation expenses and attorney's fees incurred in connection with this litigation. As detailed below, the contemptuous behavior by Simon Law includes his continued falsehoods to mislead the Court and Vista as to material matters, most recently at the July 16, 2019 evidentiary hearing ("the hearing").

Prior to the hearing he declared that Fortress was a "captive intermediary" under common ownership and that he had created, prepared and submitted the export documents in the name of Fortress even though the sales were being made by Lawson to the customers in China and not to Fortress. He acknowledged at the Lawson Records Deposition that Fortress did not re-sell the Lawson pork to Chinese customers. Yet, at the hearing, he insisted Fortress was merely a Lawson customer who purchased pork for export to China.

The export records subject to the subpoena issued to Fortress Foods were required by law to be maintained by both Fortress and Lawson as they were both listed as the applicant/exporter on official Federal filings. (HE 11). Every aspect of the sale and export of the Smithfield Vista pork was handled by Simon Law. His denials at the hearing are simply untrue and cannot be reconciled with his earlier version of the "truth".

Law and Lawson are in contempt because: (1) they failed to comply with the Court's order issued on April 18, 2019 (D.E. 149) to produce all "Fortress records" relating to the export of Smithfield-Vista pork products and their incredible claims in their opposition brief that they discarded key documents is neither credible nor a valid excuse; (2) Law lied about his interest

1

and control over Fortress, having previously admitted that Fortress was his "captive intermediary" in common ownership with Lawson Foods; (3) Lawson and Law are the alter ego of the subpoenaed party Fortress; (4) Fortress was used by Simon Law to conceal Lawson's misconduct and deliberate evasion and violation of the Smithfield Vista agreements; (5) Simon Law should be held in direct contempt for his false testimony before this Court on July 16, 2019.

Case dispositive sanctions against Law and Lawson are necessary and warranted at this juncture, as the Court has already exhausted non-dispositive remedies. Despite the Court's commendable efforts, nothing has proven effective in curtailing Law's and Lawson's abuses.

Law and Lawson dominated and controlled Fortress, and they controlled Fortress's export activities as a "captive."  The domination and control was so absolute on the part of Simon Law that he made all decisions, created the export documents, and managed the entire logistics process under the names of Lawson and Fortress.  Yet, at the hearing, Simon Law sought to distance himself from Fortress and claimed the Fortress export documents were prepared by unnamed others.  However, he previously admitted under penalties of law that he, not unnamed others, had created export documents in Fortress' name (HE 6, ¶ 40-41.)

Lawson's Opposition to Vista's motion to compel and order Respondents to Show Cause as to Contempt downplayed and materially mischaracterized Fortress just as a pork customer of Lawson. This falsehood was repeated at the hearing by Simon Law.  Lawson represented: "Fortress Foods, LLC sometimes purchased product from Lawson and shipped it to China."  (HE 13, p. 10.)

In response to the Court's questions to clarify his testimony, it was uncovered that Fortress never paid Lawson for the product and that the product was in fact sold by Lawson to customers in PRC who paid Lawson directly.  Simon Law had earlier declared that the PRC customers were doing business with and paying Lawson. (HE 6, ¶17-40.)  Simon Law decided whether the pork exports would be characterized as being exported and sold by Lawson or Fortress for specific shipments to PRC. (See, Ex. 10, 11, and 16.)   Law directed Gerlach to bill Lawson on its account for all the shipments in the name of Fortress. (Ex. 16.)

At the Court ordered Records Deposition on August 31, 2018, Simon Law acknowledged that the operations of Fortress and Lawson were intertwined. (HE 9, 243:13-245:5.)  Law used Fortress on and off at will for "privacy" and to advance Lawson's business purposes.  (Id. at 247-249). Fortress was formed on June 9, 2016 (HE 14)—less than three weeks after Lawson entered into the agreement with Vista and Smithfield not to ship Vista-Smithfield pork products to PRC. (See, Ex. 2 to Fifth Amended Complaint, D.E. 160-2.)  Law and Lawson began shipping under the name of Fortress because it knew that Smithfield would be monitoring its exports.  (HE 9, 246-249.)  Law admitted that Fortress was used for Lawson business until Lawson's AES number was de-listed so it could hide its conduct.  Lawson then stopped shipping its product through Fortress as soon as its number was unlisted by Customs and Border Protection. (Id.)  By contrast at the hearing he claimed the decisions were made by Fortress and not him or Lawson.

The few documents produced by Lawson in discovery in the name of Fortress, had Law and Lawson's "fingerprints" all over them. The only contact name on Fortress's invoices was that of Law's wife, Ada Law (HE 11, LAWSON_006842-43).   In addition, Fortress had no listed phone number, and the only phone number on Fortress's invoices is the same phone number (Id.) listed on Lawson's credit application with Vista (Ex. 1 to Complaint, Doc. No. 160-1) and on Lawson's letterhead as that for Simon Law and Lawson (Ex, 3 to Complaint, Doc. No. 160-3).

2

The address on the Fortress invoices is commercial office space leased only to Lawson. (HE 3, Baker00001-00002). The landlord Baker Properties had no documents to produce from Fortress, only documents from Lawson and Simon Law. (HE 3.)

Since discovery proceedings commenced in the Spring of 2018, Law and Lawson have played an unabated game of "hide the ball" with the Court since his first false declaration dated March 28, 2018. Despite the Court's June 26, 2018 order that Lawson document and detail its export of pork to China or verify its counsel's representations that Lawson never exported to China, Simon Law continues his efforts to mislead the Court and Vista as to Lawson's export activities. At the hearing Law endeavored to run away from what he had done by offering more material falsehoods and denials. However, he previously admitted that his use of Fortress on official filings was not bona fide and that the commercial invoices he submitted were not reflective of the reality of the relationship between Lawson, Fortress and the customers in China:

    a. At the hearing Simon Law insisted that Fortress was a customer that purchased pork from Lawson that Fortress then sold to alleged foreign affiliates in Shenzhen, China, conflicting with his prior sworn testimony

> **August 31, 2018 Lawson Records Deposition-Testimony of Simon Law:**
> Q. All I'm asking you is if Fortress appears as the shipper or the exporter of Smithfield Vista product, was Fortress also the company that was selling the product to Shenzhen?
>> MR. MARMON: I object to the form.
>> THE WITNESS: Lawson would be the company that was selling the product to Shenzhen.
>
> …
> Q. Did Lawson sell the product to Fortress and then that company sold the product to Zhao? MR. MARMON: I object to the form.
> THE WITNESS: No, Lawson made the sale.
> (HE 9, 243:8-245:5.)

    b. When Simon Law was asked by Vista's counsel at the hearing who decided to use Fortress' name as the exporter on official filings for pork going to China, he insisted that it was not Lawson's decision or his decision. Instead he claimed the owners of Fortress made this decision. Yet, at the Records Deposition, when asked why Fortress' name appeared on certain bills of lading as the shipper, rather than Lawson, he said it was "a prudent business decision *Lawson* made." (HE 9, 244:17-22. (***emphasis supplied***).

    c. At the hearing, Simon Law insisted that Lawson and Fortress were unaffiliated entities. Yet,
he signed the COSCO shipping contract representing that the two companies were not only affiliated but had common ownership. (Ex. 17, Cosco Contract, LAWSON_2343 to 2346.) The COSCO contract reflects it was specifically amended for the purpose of adding Fortress as an affiliated entity to Lawson under common ownership.

    d. When confronted with his initial false declaration at the hearing, Law claimed that it was incorrect because his former counsel misunderstood what he told them. However, in HE 6, at ¶ 2-4 Law gave an entirely different explanation to the Court as to what transpired: "I omitted facts I had forgotten, or which I did not believe were relevant…" (Id. at ¶ 4.) The Law "misunderstanding" excuse is entirely new.

    e. At the hearing, Law testified that he and Lawson only obtained the USDA Food Safety Certificate of Wholesomeness for the product shipped in the name of Fortress to the PRC. However, this is contradicted by Law's Corrected Declaration which states that Lawson created or compiled the following documents for transmission to Optimize in connection with the

shipment of Vista-Smithfield product to Lawson's Chinese customer, Mr. Zhao[1] :  Bill of Lading; Certificate of Wholesomeness; Chinese translation of Certificate of Wholesomeness; Additional Certificate for the Export of Pork and Pork Products to China"; Certificate of Origin; Commercial Invoice;  Packing List; Batch No. Declaration; Statement of No Solid Wood Packaging Materials; Insurance certificate. (HE 6 ¶¶ 40-41.)   The Court should reject Law's efforts at the evidentiary hearing to avoid the consequences of admitting his central role with both Lawson and Fortress.

    f.   In response to the Court's inquiry at the evidentiary hearing, Simon Law claimed that Lawson commingled pork product from various suppliers for export to China and therefore there would be no way to determine whether and to what extent Smithfield-Vista product was shipped. He adopted the remarkable position that despite being a USDA inspected and licensed facility, he has no records to trace the source/supplier of the five million pounds of pork that Lawson/Fortress exported outside the United States in just a two-year period.  On the basis of that testimony, and the grave public health risk presented, Vista respectfully suggests that a referral by the Court to the USDA to investigate Lawson's operations is warranted and appropriate.  Furthermore, this testimony conflicts with an earlier declaration by Simon Law where he claimed that Smithfield pork being exported to China was never mixed or commingled with other product or suppliers. (HE 6, 16-17, 44.)

This Court has the power to hold Simon Law and Lawson in civil contempt for their continued efforts to evade their obligations and subvert the litigation process.  See, 28 U.S.C. §636. Where, as here, the magistrate judge presides with the consent of the parties, the judge "may exercise the civil contempt authority of the district court." 28 U.S.C. §636(e)(3)-(4).   In crafting an appropriate remedy, the Court should consider "(1) the character and magnitude of the harm threatened by the continued contumacy; (2) the probable effectiveness of any suggested sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the burden of the sanction upon him." *Dole Fresh Fruit Co. v. United Banana Co., Inc.*, 821 F.2d 106, 110 (2d Cir.1987). A court may also "award appropriate attorney fees and costs to a victim of contempt," particularly where the violation of the court order was "willful." *Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir.1996).  In addition, Federal courts have other sources of authority to impose sanctions under the Federal Rules including, as pertinent here, those found in Fed. R. Civ. P. 16(f), 37(b), and 45, which include without limitation the awarding of attorney's fees, a finding of contempt, the striking of pleadings in whole or in part, and rendering a default judgment against a disobedient party.  See, e.g. *Leadsinger, Inc. v. Cole*, No. 05 CIV. 5606(HBP), 2006 WL 2266312, at *24 (S.D.N.Y. Aug. 4, 2006); *see also S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 149 (2d Cir. 2010)  [trial court did not abuse its discretion in imposing a default judgment]; *Schneider v. Revici,* No. 83 CIV. 8035 (CBM), 1985 WL 466, at *3 (S.D.N.Y. 1985)[striking defendant's answer and entering default judgment].

Further, in addition to statutes and Rules, this Court has the inherent power to control its docket, "impose silence, respect, and decorum, in their presence, and submission to their lawful mandates" and to  punish for contempt.  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-44 (1991).

---

[1] Mr. Zhao is Lawson's Chinese customer, who used different consignees (including Shenzhen Liaoji Trade Co.) to import the product through China's import quota system.  (Ex. 6, at ¶ 13-15, fn.1, 41.)

Here, an order compelling compliance by Fortress will likely be fruitless. Lawson and Law's egregious misconduct and cover up have protracted the proceedings and severely prejudiced Vista's ability to obtain evidence from the Defendant or affiliated parties to support its case on the merits.

Where, as here, Lawson and Simon Law dominated and controlled Fortress, and Fortress was used for the transaction of the other party's business, then liability is properly imposed upon them under an alter ego theory. *See, Bonanni v. Straight Arrow Publishers*, Inc., 133 A.D. 2d 585, 587 (1st Dept. 1987). The person running and managing and controlling this export scheme was Simon Law and Lawson---both should be held in contempt for their misdeeds.

Respectfully Submitted,

JONATHAN C. SCOTT, P.C.

*/s/ Jonathan C. Scott*
Jonathan C. Scott

Attachments

cc:  Joseph Nohavicka,  Counsel for Lawson and Simon Law (via ECF and email)