UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

VISTA FOOD EXCHANGE, INC.,

                              Plaintiff,

           -against-

LAWSON FOODS, LLC,

                              Defendant.
-----------------------------------------------------------------X

17-CV-07454 (ALC)(SN)

**OPINION & ORDER**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/1/2019

**SARAH NETBURN, United States Magistrate Judge:**

The Court has been supervising pretrial matters in this action since April 2018. For much of this period, Plaintiff Vista Food Exchange, Inc. ("Vista") has complained that Defendant Lawson Foods, LLC ("Lawson") has failed to comply with its discovery obligations, including by hiding certain records behind a shell company, Fortress Foods, LLC. These issues came to a head on April 18, 2019, when the Court found that Lawson had failed to produce responsive documents, potentially entitling Vista to an adverse inference at trial, and ordered Fortress Foods and its alleged managing member Hong Lin to show cause why they should not be held in contempt for failing to comply with a subpoena. The Court held an evidentiary hearing on July 16, 2019, to determine whether Fortress Foods should be held in contempt, and whether Lawson, Simon Law or both should also be held in contempt under an alter ego theory. A finding of contempt against Fortress Foods, Lawson and Simon Law is justified considering the overwhelming evidence that Lawson and Law control (or, are) Fortress Foods.

**BACKGROUND**

The Court assumes the parties' familiarity with this case and discusses only those facts necessary to support the Court's conclusion.

Vista is a wholesaler and distributor of various foods, including pork supplied by Smithfield Farmland Corp./Smithfield Foods ("Smithfield"). Fifth Am. Compl. ¶ 38 ("FAC") (ECF No. 160). For decades, Smithfield had been one of Vista's most valuable suppliers. FAC ¶ 5. Vista regularly purchased significant quantities of pork from Smithfield for re-sale to Vista's customers, including Lawson. Id. ¶ 5.

Vista's relationship with Smithfield soured in May 2016. Id. ¶ 10. Around that time, Smithfield learned that some of its pork, which was certified for domestic consumption only, had been exported to China by Lawson, who had purchased it from Vista. Id. The export of pork that was not certified for Chinese consumption potentially exposed Smithfield to penalties under Chinese law. See FAC, Ex. 2 (ECF No. 160-2). Smithfield promptly notified Vista that if any pork purchased and resold by Vista was again exported to China, it would stop selling its products to Vista. Id. ¶ 10. In response, Vista put all of Lawson's orders on hold and informed Lawson that Vista would not resume sales to Lawson unless Lawson promised not to export Vista-Smithfield pork to China. Id. ¶ 62.

In order to renew business relations, Simon Law, on behalf of Lawson, sent a letter agreement to Vista and Smithfield "promising not to ship Smithfield Farmland pork to PRC [the People's Republic of China], under any circumstance . . . ." FAC, Ex. 15. This letter, signed by Law, is dated May 20, 2016 (the "May 20 letter agreement"). This lawsuit is about Lawson's compliance with the May 20 letter agreement.

Vista filed this lawsuit on September 9, 2017, after concluding that Lawson had breached the May 20 letter agreement. See ECF No. 1. It served its first discovery request on April 6, 2018. See ECF No. 140-1. Since then, there have been multiple motions and hearings over Lawson's discovery obligations and obfuscation regarding Lawson's business. See, e.g., ECF Nos. 60, 66, 123, 124, 126. For example, at a June 26, 2018 conference, counsel for Lawson stated that Lawson "never" exported pork, stating: "we don't export, we sell." June 26, 2018 Hearing, Tr. 20:16. This statement directly contradicted Lawson's counsel's statement to the Court on April 3, 2018, when he stated that product that "came from Smithfield through Vista to us [Lawson] and we shipped it to China." Apr. 3, 2018 Hearing, Tr. 15:21-22. To clarify its position, the Court ordered Lawson to produce a sworn affidavit attesting whether it exported or shipped Smithfield pork products directly to customers in China. In addition, the Court ordered Lawson to produce all documents related to sales to third parties of Smithfield pork products purchased from Vista.

This process produced the First Law Declaration, in which Simon Law attested that Lawson did not maintain any shipping, export, sales or labeling records related to its purchase of Smithfield pork products from Vista. Law asserted that the only records Lawson retains are invoices and bills of lading organized by date (without notation of whether the product was purchased from Vista or another provider) and journal entries listing amounts paid for products sold to China. ECF No. 77-1, ¶¶ 16,19-20. The First Law Declaration also did not state—in violation of the Court's order—whether Lawson Foods had exported or shipped directly to China Smithfield pork product purchased from Vista. See Aug. 6, 2018 Hearing, Tr. 19:22-25 (finding that the First Law Declaration "in my opinion does not answer the questions that I asked related to [Lawson's] involvement in the sale of pork products, Smithfield pork products, intended for

3

shipment to China. I don't believe this declaration does that.") The Court also authorized a "Records Deposition" to further explore Lawson's record retention policies.

Days before the Records Deposition was scheduled, Lawson filed a Corrected Law Declaration. In part, the Corrected Law Declaration acknowledged that Lawson retained numerous relevant and responsive records that it had previously claimed not to possess. ECF No. 101-1, at ¶ 3. In the Corrected Law Declaration, Law stated that "Lawson has not sold any pork products to China since mid-2017 due to unfavorable political and economic conditions." Id. at ¶ 10. However, Law later stated that "Lawson shipped product to China through a captive intermediary called Fortress Foods, LLC." Id. at ¶ 41. The Corrected Law Declaration further described business relations with a China-based customer named Ling Zhao. Id. at ¶¶ 13-15. Law also supplemented his prior statements about Lawson's record retention policies. Id. at ¶¶ 16-40.

The discovery disputes culminated in Vista's motion, filed on February 4, 2019, seeking an order: (1) compelling Lawson to produce all documents related to tracking and shipping exports of pork to China from January 1, 2015, to the present; (2) compelling Lawson to produce all documents related to the export of pork to China that Lawson was required to create and retain under various Federal laws; (3) compelling Lawson to produce log-in information for an online portal account that it used to submit information to Customs and Border Protection ("CBP"); and (4) finding that Defendant's production of documents on January 15, 2019, did not comply with its obligations under Rule 34. See ECF No. 138. The motion also requested that the Court order Fortress Foods, managing partner Hong Lin, and Ada Law, Simon Law's wife, to show cause why they should not be sanctioned and held in contempt for failing to comply with Vista's subpoena. Id.

As relevant here, the Court granted in part this relief, finding that "Lawson's production has been inadequate and that it has failed to produce the documents that it should have maintained under both the regulatory schemes that govern its exporting business and its obligations to preserve documents once it is aware of the possibility of litigation over the subject matter." ECF No. 149, at 3. The Court ordered Lawson "to produce all records that reflect its purchase and exporting of Smithfield-Vista Food pork products to the PRC from January 1, 2015, to the present." Id. The Court further held that "if Lawson fails to comply with this order, Vista Food is entitled to an adverse inference at trial regarding Lawson's failure to maintain its records." Id. The Court deferred ruling on the motion to compel Lawson to obtain and produce documents from Fortress until after an evidentiary hearing into the relationship between Fortress and Lawson. Id. at 3. The Court also ordered Fortress Foods and Hong Lin to show cause why they should not be held in contempt for failure to respond to a lawful subpoena. Id. at 4. The Court issued an order scheduling a hearing for the purpose of: (1) determining "whether Hong Lin and Fortress Foods should be held in contempt for failing to comply with a subpoena;" (2) hearing "testimony from Simon Law regarding the relationship between Fortress Foods and Lawson;" and (3) determining "whether any contempt finding should also be entered against Lawson, Simon Law or both." Id. at 5.

The evidentiary hearing was held on July 16, 2019. Simon Law testified, but no one from Fortress Foods appeared. The overwhelming picture established at the evidentiary hearing is that Simon Law, through Lawson, established Fortress Foods solely to evade Lawson's obligations under the May 20 letter agreement and to continue to sell pork to China. Lawson has produced no evidence to establish the existence of a legitimate business relationship with Fortress Foods.

5

To the contrary, the evidence shows that Fortress Foods was merely a front for Lawson. First, on June 6, 2016, within weeks of the May 20 letter agreement, Fortress Foods was registered with the New Jersey Secretary of State. ECF No. 167-8. Fortress Foods' business records list its address at 22-24 Camptown Road, Irvington, New Jersey, a warehouse facility leased to Lawson. At the evidentiary hearing, Law testified that, "since the inception" of Lawson's lease of the Camptown Road facility, he has rented that facility to other entities, first Fortress Foods, and later SDJ Trading. Tr. 10:3-11:18. Law testified that there was no sublease agreement between Lawson and Fortress Foods because it was "more of a verbal agreement, like having a roommate in New York City." Tr. 16:24-25. Fortress Foods never paid Lawson rent. Tr. 15:4-5. Eventually, SDJ Trading took over the space and began paying rent directly to the landlord, Baker Properties. Tr. 14:6-7. In addition to listing its corporate address as the facility leased by Lawson, Fortress Foods' invoices listed fax and telephone numbers that are associated with Lawson. Compare ECF No. 167-6 at 6-7 with ECF No. 160-1 and with 160-3 at 1.

Second, around the same time that Fortress Foods was incorporated, Lawson took steps to delist his Automated Export System ("AES") number with the U.S. Customs and Border Patrol. Tr. 49:17-50:24. Law testified that he took these steps because of Smithfield's and Vista's representation that they would be monitoring Lawson's exporting to ensure compliance with the May 20 letter agreement. Law stated that he believed delisting his AES number was necessary to protect his customer list from his competitors. Law further testified that from the time of the May 20 letter agreement until his AES number was delisted, he directed his freight forwarder, FC Gerlach ("Gerlach") to list Fortress Foods as the exporter on all Customs and Border Patrol paperwork. Tr. 55:24-56:20. During this time, however, the same shipments to China would be registered with the U.S. Department of Agriculture ("USDA") listing Lawson Foods as the

exporter because Lawson had a USDA certification number and Fortress Foods did not. Tr. 50:21-24. Once its AES number was delisted, Lawson renewed shipments to China. See ECF 167-5 (email from Law to FC Gerlach instructing them to switch the name of the exporter from Fortress to Lawson in February 2017).

Third, in this litigation, Law filed a Corrected Declaration in which he stated that Lawson sometimes "shipped product to China through a captive intermediary called Fortress Foods, LLC." ECF No. 101-2. In these instances, "Lawson listed Fortress as the product's shipper." At the evidentiary hearing, Law testified that product that had been purchased by Lawson Foods was shipped to China through Fortress Foods. Id. at ¶ 41. Lawson "paid for everything," meaning all invoices from Gerlach for customs and cargo clearing services were invoiced to and paid by Lawson. Tr. 57:25.

Fourth, during the evidentiary hearing, Law testified that Lawson entered into a service contract with COSCO Container Company Lines ("COSCO") for marine cargo shipment rates from the United States to China. The COSCO agreement includes a verification that certain companies are affiliated with Lawson "by way of mutual ownership" for purposes of obtaining the contractual freight rates. Tr. 63:7-14. In an amendment to this contract, Lawson verified that Fortress Foods was an affiliated company under the terms of the COSCO contract. Tr. 65-18. Law testified that Lawson paid all shipping expenses to COSCO for shipments listed under Fortress Foods' name. Tr. 66:9.

Fifth, Law testified that for shipments to China exported under Fortress Foods' name (but certified under Lawson's USDA number), the Chinese customer would pay Lawson directly for the product. Tr. 69:1-9. Law testified that he did not know whether Fortress Foods received

money "on the side," but stated that Lawson did not pay Fortress Foods, and Fortress Foods did not pay Lawson in connection with these sales. Tr. 69:17-70:1.

Considering this evidence, the only conclusion to draw is that Lawson, through its managing member and president Simon Law, created Fortress Foods solely to evade its contractual obligations to Vista (and Smithfield). Lawson has further failed to comply with its discovery obligations both by inadequately maintaining its records and by falsely characterizing records ostensibly under the control of Fortress Foods as beyond its reach.

## DISCUSSION

In their post-hearing submissions, Vista asks the Court to hold Fortress Foods and Lin "in contempt with substantial daily fines from the October 15, 2018 due date on the subpoena . . . to the date of the Court's order." ECF No. 167 at 1. Vista also asks the Court to find Law and Lawson in contempt and to "impose terminating sanctions, a default judgment and an order that both Law and Lawson are jointly and severally liable for all of Vista's litigation expenses and attorney's fees incurred in connection with this litigation." Id. The parties have consented to the Court's jurisdiction for purposes of addressing this motion. ECF No. 171.

### I.  Applicable Law Governing Court's Authority to Sanction

If a party fails to obey an order to provide or permit discovery, the court may issue further just orders. Fed. R. Civ. P. 37(b)(2)(A). In determining the appropriate sanctions to impose, courts consider the following factors: (1) the willfulness of the non-compliant party or the reasons for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the noncompliant party has been warned of the consequences of noncompliance. World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp., 694 F.3d 155, 159 (2d Cir. 2012) (citing Agiwal v. Mis Island Mortg. Corp., 555 F.3d 298, 302 (2d Cir.

2009)). These factors are not exclusive, and it is not an abuse of discretion to impose sanctions where only some of the factors have been implicated. S. New England Tel. Co. v. Global NAPS Inc., 624 F.3d 123, 144 (2d Cir. 2010).

Under Rule 45, a court "may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it." Fed. R. Civ. P. 45(g). A finding of contempt is appropriate when it is demonstrated that "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 655 (2d Cir. 2004) (quoting King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir. 1995)). It "need not be established that the violation was willful." Id. (citing Donovan v. Sovereign Sec. Ltd., 726 F.2d 55, 59 (2d Cir. 1984)). The movant bears the burden of proving contempt by clear and convincing evidence. Latino Officers Ass'n City of N.Y., Inc. v. City of New York, 558 F.3d 159, 164 (2d Cir. 2009). A finding of civil contempt is intended to coerce compliance with a court order and to compensate a plaintiff. CBS Broad. Inc. v. FilmOn.com, Inc., 814 F.3d 91, 101 (2d Cir. 2016) (citing Local 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C., 478 U.S. 421, 443 (1986)). A sanction coerces a defendant when it "force[s] the contemnor to conform his conduct to the court's order." Id. (citation omitted).

## II. Application

### A. Fortress Foods Failed to Comply with a Subpoena and Court Order

Fortress Foods was served with the subpoena through its registered agent. See ECF 140-13. The subpoena clearly identified the documents to be produced. When Fortress Foods failed to respond to the subpoena, Vista moved to hold it in contempt, and that motion was served on

9

Fortress Foods' registered agent. Finally, in ruling on Vista's motion, the Court ordered Hong Lin and Fortress Foods to appear at an evidentiary hearing, and *that* order was also served on Fortress Foods' registered agent. Thus, I find that the subpoena and the Court's order were clear and unambiguous, the proof of noncompliance is clear and convincing, and Fortress Foods has not complied at all. A finding of contempt is therefore appropriate. See Paramedics, 369 F.3d at 655 (affirming finding of contempt where court order was clear and appellant had "not demonstrated a diligent attempt to comply with the district court's orders in a reasonable manner.").

### B. Lawson and Simon Law Are Liable for the Conduct of Fortress Foods

Vista argues that Lawson and Simon Law so dominated and controlled Fortress Foods that any liability imposed upon Fortress Foods is properly imposed upon Lawson under an alter ego theory. ECF No. 167. In its post hearing brief, Lawson contends that it can be held liable for Fortress Foods' misconduct only if it is established that they operated under a "single integrated enterprise." ECF No. 169. Under a single integrated enterprise theory, multiple legally distinct entities may be treated as one based on certain factors, such as interrelation of operations, centralized control of labor relations, and common management, ownership and financial control. See Brown v. Daikin America Inc., 756 F.3d 219, 226-27 (2d Cir. 2014).

Without a single citation to the record, Lawson baldly claims that none of the factors needed to justify its liability for Fortress Foods' misdeeds is present. It claims that Fortress Foods is wholly separate from Lawson; that they share no management or owners and that their relationship is merely one of supplier-customer. This argument is not credible. The Court need not find that Fortress Foods operated in an integrated fashion with Lawson—Fortress Foods is Lawson. See Masefield AG v. Colonial Oil Indus., No. 05 CIV. 2231 (PKL), 2005 WL 2105542,

10

at *5 (S.D.N.Y. Sept. 1, 2005) ("If one corporation completely dominated the actions of another corporation with respect to the transaction at issue, and that domination was used to defraud or injure the party seeking relief, the court may find that the dominated corporation was the alter ego of the dominating corporation and hold the dominating corporation liable for the actions of its alter ego."). Fortress Foods' operation appears to be entirely in sync with Lawson's desire to hide its Chinese business from Vista. Fortress Foods was incorporated immediately after the May 20 letter agreement, and Lawson seems to have ceased its "business relationship" with it as soon Lawson's AES number was delisted. Law testified that Lawson paid for all shipping expenses for and never received rent from Fortress Foods. Law also stated that Fortress Foods used Lawson's USDA certification on exports purportedly shipped by Fortress Foods. Although Lawson maintains that its business relationship with Fortress Foods is arm's length, Law testified that Fortress Foods never paid Lawson for anything and that Lawson never paid Fortress Foods for anything, either. This is not a business relationship but a cover-up. Accordingly, I find by overwhelming evidence that Lawson can be held liable for the conduct of Fortress Foods.

Separately, I consider whether Simon Law may be held personally liable for Fortress Foods' conduct. In order to hold Law accountable for Fortress Foods' malfeasance, it is necessary that there be sufficient facts to pierce the corporate veil. See EED Holdings v. Palmer Johnson Acquisition Corp., 387 F. Supp. 2d 265, 273 (S.D.N.Y. 2004) (veil piercing empowers a claimant to hold owners liable for corporate obligation). The veil piercing law of the state of incorporation, in this case New Jersey, applies. See Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P., 491 B.R. 335, 346 (S.D.N.Y. 2013) (citing Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)). New Jersey, like most jurisdictions, requires a showing: (1) that there is "such unity of interest and ownership that the separate personalities of the corporation

and the individual no longer exist"; and (2) that veil piercing is necessary to prevent fraud or injustice. See Linus Holding Corp. v. Mark Line Indus., LLC, 376 F. Supp. 3d 417, 425 (D.N.J. 2019). As detailed above, the overwhelming evidence supports the conclusion that Law established Fortress Foods to protect his own personal interests—namely to escape his obligations with Vista—and that for all intents and purposes, he ran Fortress Foods. Specifically, Law testified that he instructed Gerlach how to prepare export documents for shipments ostensibly exported by Fortress Foods and paid for those shipments. Law also told Gerlach to stop listing Fortress Foods and to resume listing Lawson on all paperwork once Lawson's AES number was delisted. Law further testified that he signed an amendment to his contract with COSCO to list Fortress Foods as an entity with "mutual ownership" with Lawson in order to ship through Fortress Foods at Lawson's preferred rate. Accordingly, I find that Fortress Foods is the alter ego of Simon Law, and that the corporate veil is appropriately pierced so that Law may be held liable for the conduct of Fortress Foods.

Finally, I decline to sanction Hong Lin, the principal of Fortress Foods. Hong Lin has not appeared before this Court, and there is an open question as to whether he even resides in the United States. Moreover, because Vista's theory is that Fortress Foods was controlled entirely by Lawson and Law, Vista has not established by clear and convincing evidence that Hong Lin is responsible for the conduct of Fortress Foods.

### C. Lawson, Law and Fortress Foods Are Held in Contempt

The Court has already found that Lawson failed to comply with its discovery obligations. ECF No. 149. It is undisputed that Fortress Foods has failed to comply with a lawfully issued subpoena and the Court's order, and the Court finds that Lawson and Law may be held liable for these violations. As set forth above, the purpose of a finding of civil contempt is to coerce

compliance with a court order. Given the history of Lawson's failure to comply with basic discovery obligations, and my finding that Law was purposely evasive if not perjurious during his testimony at the evidentiary hearing, I have genuine doubt that Lawson will chose to comply with its discovery obligations. That said, because the Court has not specifically warned Lawson that it risked entry of default judgment for its discovery misconduct, I find that the entry of such severe sanction would be unfair. See Guggenheim, 722 F.3d at 452 (recognizing the due process interests in adequately advising a defendant that his conduct risked the entry of default).

Accordingly, the Court holds Fortress Foods and Lawson in contempt and imposes a daily fine of $100 from the October 15, 2018 due date of the Fortress Foods subpoena. Considering the Court's finding with respect to Law's role in Fortress Foods, that fine is entered against Fortress Foods, Lawson and Law jointly and severally. Fortress Foods and Lawson have 14 days from the date of this order to comply with the subpoena. If they comply in full, Lawson may move to set aside the finding of civil contempt and the fine. If, however, the past is prologue and Lawson again fails to produce responsive documents, Lawson is warned that, upon application from Vista, the Court will enter a default against Lawson and move the case to a determination of the appropriate judgment.

In addition, because Lawson's conduct has not been substantially justified, the Court orders Lawson to pay Vista's attorney's fees for the work performed in filing its February 4, 2019 motion and in connection with the July 16, 2019 evidentiary hearing. The parties are further ordered to meet and confer to agree upon an appropriate fee amount. If they cannot agree, within 30 days of this order, Vista may submit a fee application for the Court's consideration.

## CONCLUSION

The Court finds that Fortress Foods and Lawson are in contempt of Court. The Court imposes a fine of $100 per day, starting on October 15, 2018. That fine is imposed jointly and severally upon Fortress Foods, Lawson and Simon Law. No order of contempt is entered against Hong Lin. Lawson may move to set aside this finding if it complies with the Court's prior orders and the subpoena served upon Fortress Foods within 14 days. If it does not comply, Lawson is warned that, upon Vista's application, the Court may enter a default and move this case to a determination of the amount of judgment. The parties are further ordered to meet and confer with respect to an appropriate award of attorney's fees as set forth herein.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

Dated: November 1, 2019
    New York, New York